# Exhibit A

Case 1:16-cv-01325-ESC   ECF No. 32-1, PageID.107   Filed 02/28/18   Page 2 of 8

Dunigan vs.                                                    Officer Derek Nugent
Officer Nugent, et al.                                         December 19, 2017

## Page 1

```
 1              UNITED STATES DISTRICT COURT
 2            FOR THE WESTERN DISTRICT OF MICHIGAN
 3                       SOUTHERN DIVISION
 4
 5   GORDA DUNIGAN, as Personal
 6   Representative for the ESTATE
 7   OF JAMES DUNIGAN, Deceased,
 8                Plaintiff,
 9        vs.              Case No. 1:16-CV-01325
10                              Hon. Janet T. Neff
11   OFFICER DEREK NUGENT and    Mag. Judge Ellen S. Carmody
12   OFFICER ERIC SHAFFER,
13                Defendants.
14   and
15   GORDA DUNIGAN, as Personal
16   Representative for the ESTATE
17   OF JAMES DUNIGAN, Deceased,
18           Plaintiff,   Case No. 16-CV-01324
19        vs.                   Hon. Janet T. Neff
20   BRONSON METHODIST HOSPITAL,    Mag. Judge Ellen S. Carmody
21                Defendant.
22   _____
```

## Page 2

```
 1        The Deposition of OFFICER DEREK NUGENT,
 2        Taken at 241 West South Street,
 3        Kalamazoo, Michigan,
 4        Commencing at 11:11 a.m.,
 5        Tuesday, December 19, 2017,
 6        Before Peggy S. Savage, CSR-4189, RPR.
 7
 8   APPEARANCES:
 9
10   JAMES J. HARRINGTON, IV
11   Fieger, Fieger, Kenney & Harrington, P.C.
12   19390 West 10 Mile Road
13   Southfield, Michigan 48075
14   (248) 355-5555
15   j.harrington@fiegerlaw.com
16        Appearing on behalf of the Plaintiff.
17
18   ALLAN C. VANDER LAAN
19   Cummings, McClorey, Davis & Acho, P.L.C.
20   2851 Charlevoix Drive, S.E., Suite 327
21   Grand Rapids, Michigan 49546
22   (616) 975-7470
23   avanderlaan@cmda-law.com
24        Appearing on behalf of Defendants Officer Derek
25        Nugent and Officer Eric Shaffer.
```

## Page 3

```
 1   JOHN C. O'LOUGHLIN
 2   Smith, Haughey, Rice & Roegge, P.C.
 3   100 Monroe Center Street, N.W.
 4   Grand Rapids, Michigan 49503
 5   (616) 774-8000
 6   joloughlin@shrr.com
 7   Appearing on behalf of Defendant Bronson Methodist
 8   Hospital.
 9
10   ALSO PRESENT:
11   Richard O. Cherry
12   Detective Eric Shaffer
```

## Page 4

```
 1   TABLE OF CONTENTS
 2
 3   WITNESS                                  PAGE
 4   OFFICER DEREK NUGENT
 5
 6   EXAMINATION BY MR. HARRINGTON              5
 7   EXAMINATION BY MR. O'LOUGHLIN            102
 8   EXAMINATION BY MR. VANDER LAAN           115
 9   RE-EXAMINATION BY MR. HARRINGTON         117
10   RE-EXAMINATION BY MR. O'LOUGHLIN         118
11   RE-EXAMINATION BY MR. HARRINGTON         128
12   RE-EXAMINATION BY MR. O'LOUGHLIN         128
13
14        EXHIBITS
15
16   EXHIBIT                                  PAGE
17   (Exhibits attached to transcript.)
18
19   DEPOSITION EXHIBIT 1                       28
20   DEPOSITION EXHIBIT 2                       28
21   DEPOSITION EXHIBIT 3                       45
22   DEPOSITION EXHIBIT 4                       90
```

**Page 29**

1  Q. Okay. On the date of May 6, 2016, did you have a
2  different assignment?
3  A. Yes, sir. I came in for overtime that day to work.
4  Q. So what does that mean?
5  A. There was an opening for overtime at Bronson hospital,
6  to work there specifically at the emergency room.
7  Q. So how did you know that?
8  A. I believe it was posted in our scheduling. We have an
9  online scheduling system that has the overtime
10 availability posted, and I was able to sign up for it.
11 Q. So help me out here. If you're looking for overtime,
12 you can go to some like intranet and see if there's
13 any overtime availability anywhere?
14 A. Yes, sir.
15 Q. And maybe a day or so in advance, whatever it was, you
16 did see that there was some overtime available at
17 Bronson?
18 A. Yes, sir.
19 Q. How does that work? How does, I guess, Bronson
20 hospital let you, the police department, know that
21 they need overtime work?
22 A. I don't know the specifics of how that all works. I
23 just know that there's an agreement between Bronson
24 hospital and the police department to staff their
25 emergency room with a police officer.

**Page 30**

1  Q. When you say "agreement," do you know if there's like
2  a written contract or --
3  A. I believe that there is, yes.
4  Q. Have you ever read it?
5  A. I have not.
6  Q. In order to do any type of work, being police
7  activity-type work, at Bronson hospital, do you
8  receive any type of additional training from anybody
9  with respect to that work?
10 A. No, sir.
11 Q. Does anybody from Bronson provide you with any type of
12 orientation as to the hospital?
13    MR. O'LOUGHLIN: Form and foundation.
14    THE WITNESS: No, sir.
15    BY MR. HARRINGTON:
16 Q. All right. So as of May of 2016, I presume this
17 wasn't the first time you had ever performed any work
18 at Bronson hospital; is that fair?
19 A. Yes.
20 Q. Approximately, how many times have you picked up a
21 shift or some type of detail at Bronson hospital?
22 A. Guessing, two or three times.
23 Q. Okay. So not too many?
24 A. No, sir.
25 Q. Over what time period? Had it been the previous few

**Page 31**

1  months? Previous few years?
2  A. Previous few years.
3  Q. So explain to me what happens when you sign up for a
4  shift or detail at Bronson hospital. How does that
5  work?
6  A. After you sign up, you show up at the time you're
7  scheduled to show up for, and you take care of any
8  policing needs in the ER, in the emergency room.
9  Q. Like what?
10 A. If any crimes occur at the -- in the emergency room, a
11 report needs to be taken. For a crime that even
12 occurs somewhere else, if someone comes into the
13 emergency room and needs to report a crime, we're
14 there to provide that service.
15 Q. All right. So when did you start your shift on May 6,
16 2016, which is the date of the Dunigan incident?
17 A. The shift started at 6:00 a.m.
18 Q. You arrived there in a patrol car?
19 A. Yes.
20 Q. Okay. Why do you hesitate?
21 A. It was a patrol -- the only car we had available was a
22 car. It was not a fully equipped patrol car. It
23 didn't have -- it was unmarked. It didn't have a
24 security cage in the backseat for transporting
25 prisoners. It was a car that was an extra car, and

**Page 32**

1  that was the only one I had available to me at the
2  station that I -- I dress out of. I put my uniform on
3  in it.
4  Q. Was that because this was an overtime shift and all
5  the other scout vehicles were out on the road?
6  A. Yes, sir.
7  Q. So you took this -- we'll just call it the "unmarked
8  car" --
9  A. Yes, sir.
10 Q. -- from the station to the hospital, correct?
11 A. Yes, sir.
12 Q. Had you talked with anybody from the hospital, letting
13 them know that you were coming on that shift?
14 A. No, sir.
15 Q. Since you've only done it a couple times before this
16 Dunigan incident, did you have an understanding as to
17 where you were going to go to check in to let anybody
18 know you were there?
19 A. Yes.
20 Q. Where?
21 A. Their security office in the emergency room.
22 Q. Do you know any of the security officers that work
23 over there?
24 A. Not by name. Just by -- by -- you know, I'm familiar
25 with who they are because I come there.

Case 1:16-cv-01325-ESC   ECF No. 32-1, PageID.109   Filed 02/28/18   Page 4 of 8

| Dunigan vs. Officer Nugent, et al. | Officer Derek Nugent December 19, 2017 |
|---|---|

**Page 37**

1 hospital?
2 A. Yes, sir.
3 Q. And why was that?
4 A. Because it did not — it was not equipped to transport
5  prisoners.
6 Q. Okay. But why didn't you just let Officer Shaffer
7  take Mr. Dunigan and you follow behind in the unmarked
8  vehicle?
9 A. I don't know why that decision was made. I don't
10  remember.
11 Q. All right. Do you remember arriving to Bronson
12  hospital on May 6, 2016?
13 A. Yes, sir.
14 Q. After you parked the vehicle, what did you do?
15 A. I went into the security office and spoke with members
16  of Bronson security and the officer who worked the
17  night shift who was there, the police officer.
18 Q. Do you know the names of those individuals you spoke
19  with?
20 A. I can only remember the police officer's name. I
21  don't remember the names of the individual security
22  officers that were working.
23 Q. Who was the police officer?
24 A. His name was Ernest Knauf.
25     MR. VANDER LAAN: K- --

**Page 38**

1     BY MR. HARRINGTON:
2 Q. K-n-a-u-f-f?
3 A. I believe it's just one "f."
4     MR. HARRINGTON: I'm sorry, what were you
5  saying, Allan?
6     MR. VANDER LAAN: I was going to spell it.
7     MR. HARRINGTON: Do you know if that's the
8  right spelling?
9     MR. VANDER LAAN: Is it K-n-o-p-h?
10     BY MR. HARRINGTON:
11 Q. Or Koph, K-o-p-h?
12 A. I think it's K-n-a-u-f.
13 Q. K-n-a-u-f. And he's a Kalamazoo police officer?
14 A. Yes, sir.
15 Q. And he was doing the Bronson detail before you?
16 A. Yes, sir.
17 Q. You were relieving him?
18 A. Yes, sir.
19 Q. When you arrived, did he leave?
20 A. Yes, sir.
21 Q. Was he involved in the Dunigan, I guess, incident in
22  any way that you're aware of?
23 A. Yes.
24 Q. Okay. What was his role?
25 A. He had contact with Mr. Dunigan before I did.

**Page 39**

1 Q. Did Officer Knauf brief you at all on Mr. Dunigan?
2 A. Yes, sir.
3 Q. And what did he tell you?
4 A. I remember him telling me that Mr. Dunigan had been
5  discharged from the hospital and was being allowed to
6  sit in the waiting room area until 6:00 a.m., where at
7  that point he was going to be getting and leaving on a
8  city bus.
9 Q. What time did the buses start running?
10 A. 6:00 a.m.
11 Q. Do you know where the nearest bus stop or pickup
12  location would be in relation to the emergency
13  department area where Mr. Dunigan was to where he
14  would need to go?
15 A. I don't know exactly where it's at, but it's right on
16  the street out front, within walking distance of the
17  emergency room entrance.
18 Q. So you understood that he was waiting for the buses to
19  start running?
20 A. That was my understanding, yes.
21 Q. What else did Officer Knauf tell you about
22  Mr. Dunigan?
23 A. I don't remember.
24 Q. Okay. And I might be jumping ahead a little bit. I
25  mean, you walk into the emergency department, and then

**Page 40**

1  you head over to security to -- I guess to check in
2  and to relieve Officer Knauf, right?
3 A. Yes, sir.
4 Q. Did you know that Officer Knauf was working that
5  shift?
6 A. No.
7 Q. You knew that there was one Kalamazoo officer there,
8  right, or no?
9 A. I didn't. No, I didn't. No.
10 Q. Do you know if, under the agreement or contract
11  between Bronson and Kalamazoo, an officer is to always
12  be present at the hospital?
13 A. I know that there are certain days that they are not
14  staffed with an officer, but I don't remember what
15  days those are. It's not every day of the week.
16 Q. What was the first, I guess, order of business that
17  you spoke with, I guess, the folks at the security
18  office when you arrived?
19 A. I think that it was a discussion about the status of
20  Mr. Dunigan.
21 Q. So not to minimize, you walk in, probably, you know,
22  exchange some pleasantries like, "Hey, guys, morning,
23  how is everything, what are we looking at today,"
24  something like that, right?
25 A. Yes, sir.

**Page 41**

1  Q. And then the first thing that came up was business
2  relation- -- related was Mr. Dunigan, right?
3  A. Yes, sir.
4  Q. Who was the first person to bring up Dunigan?
5  A. I don't remember.
6  Q. Do you know if it was Knauf or somebody from the
7  hospital?
8  A. I don't remember that.
9  Q. Did anybody from the hospital, I guess the hospital
10 security staff, provide you with any information about
11 Mr. Dunigan while you guys are having this initial
12 discussion in the security office?
13 A. I'm sure that they did, but I don't remember what that
14 information was.
15 Q. And what I'm getting at is: Did any of the security
16 guys say, "Hey, look, this is just some homeless guy,
17 he's hanging around, he's already been treated, he's
18 fine," anything like that?
19 A. I don't -- I don't remember.
20    MR. VANDER LAAN: Can he refer to his
21 report or do you want just his memory?
22    MR. HARRINGTON: We're going to walk
23 through the report, Allan --
24    MR. VANDER LAAN: Okay.
25    MR. HARRINGTON: -- in really, really good

**Page 42**

1  detail. I just want to go through kind of his memory
2  now and then we'll go through it, because I know it
3  contains a lot of stuff in there.
4     MR. VANDER LAAN: All right.
5     BY MR. HARRINGTON:
6  Q. And I'm not trying to trick you. I just like to go
7  through the memory. Because, look, you wrote a
8  report, right?
9  A. Yes, sir.
10 Q. And you wrote it as truthful as possible, right?
11 A. Of course.
12 Q. Nobody ordered you to write what you wrote, right?
13 Meaning, those are your words?
14 A. Yes, they are.
15 Q. So I can read English. I know what it says. I kind
16 of like to fill in the blanks of what you saw and what
17 was going on.
18 A. Sure.
19 Q. So at some point in time, you and the other officers
20 leave the security office, right?
21 A. Yes.
22 Q. Okay. And was the first order of business to address
23 Dunigan?
24 A. Yes. I think so.
25 Q. And was there any discussion as to how that was going

**Page 43**

1  to be done?
2  A. I don't remember.
3  Q. Okay. Who was taking lead for addressing Mr. Dunigan;
4  was it you or one of the --
5  A. I addressed him by myself, so ...
6  Q. While he was sitting in a chair?
7  A. I don't remember if he was sitting or standing when I
8  addressed him initially.
9  Q. But he was in the emergency department?
10 A. Yes, he was.
11 Q. Do you recall how he appeared to you?
12 A. Not specifically, no.
13 Q. Are you able to say that he seemed completely normal
14 or did he seem off or you just don't remember?
15    MR. O'LOUGHLIN: Foundation.
16    THE WITNESS: I just don't remember.
17    BY MR. HARRINGTON:
18 Q. Do you ever remember having any discussions at any
19 time with anybody from Bronson hospital about problems
20 with, quote/unquote, homeless people coming into the
21 hospital?
22 A. I'm not sure I understand the question. I'm sorry.
23 Will you say that for me again?
24 Q. Sure. All I'm wondering is if anybody from Bronson
25 hospital had any type of discussions with you about

**Page 44**

1  issues of homeless people coming into the hospital and
2  how to address that?
3     MR. VANDER LAAN: At any time? Not just
4  this day?
5     MR. HARRINGTON: Yeah, not just this time.
6  At any time.
7     THE WITNESS: Yes.
8     BY MR. HARRINGTON:
9  Q. Okay. Tell me about those conversations.
10 A. I don't know if I can remember anything specific about
11 the conversations, but I'm sure that I've had
12 discussions with security officers in the past about
13 homeless people or any -- you know, any people that
14 are in the emergency room and what to do with them and
15 how to handle the situation.
16 Q. Okay. Can you tell me about those conversations?
17 Just generally. I mean, because you walked away --
18 look, the security staff is having a discussion with
19 you or maybe other people from the hospital are having
20 a discussion with you about homeless people or other
21 people that are in the emergency department on how to
22 handle it. I just want to know what type of general
23 information you walked away with from those
24 conversations.
25 A. Generally, I understood if -- if the -- if there's an

Case 1:16-cv-01325-ESC   ECF No. 32-1, PageID.111   Filed 02/28/18   Page 6 of 8

Dunigan vs.
Officer Nugent, et al.

Officer Derek Nugent
December 19, 2017

## Page 45

1  individual in the emergency room that they — that the
2  security staff does not want there for any — you
3  know, any reason, that the — I was to assist them in
4  helping them to remove that person from their
5  property.
6  Q. Do they make that call to remove them or do you make
7  that call? And when I say "call," decision.
8  A. I think it's — it's their property, so they make that
9  call. I am there just to facilitate and to help them.
10 Q. Do you know what the -- maybe you do or maybe you
11 don't. Do you know what the arrest authority is for
12 the security staff at Bronson?
13 A. I don't know. I don't know.
14 Q. I mean, you have a greater arrest authority than, you
15 know, a security staff that isn't licensed under
16 Public Act 330, right?
17 A. Yes, sir.
18    MARKED FOR IDENTIFICATION
19    DEPOSITION EXHIBIT 3
20    12:05 p.m.
21    BY MR. HARRINGTON:
22 Q. The document that I've handed you that I've marked as
23 Exhibit 3 is your complete report; is that correct?
24 A. It appears to be my complete narrative. Whether or
25 not it's the complete police report —

## Page 46

1  Q. No, no. I apologize. Let me rephrase. What I've
2  handed to you is your complete report that you
3  completed with respect to Mr. Dunigan; fair?
4  A. Yes, it appears to be.
5  Q. You didn't do any supplemental reports?
6  A. No, sir.
7  Q. Okay.
8     MR. VANDER LAAN: Do you have a copy in
9  front of you?
10    THE WITNESS: I do, sir.
11    MR. VANDER LAAN: Okay.
12    MR. O'LOUGHLIN: I think I got two.
13    MR. VANDER LAAN: Okay.
14    BY MR. HARRINGTON:
15 Q. Okay. If we look to the -- I guess we'll call it the
16 third section, where it says, "Briefing With Bronson
17 Security Staff." Are you there?
18 A. Yes, sir.
19 Q. In this section, it talks about how the security staff
20 was allowing Mr. Dunigan to remain at the hospital
21 until 6:00 a.m., you know, pending the city bus issue;
22 do you see that?
23 A. Yes, sir.
24 Q. Did you see anybody from Bronson tell him that?
25 A. No, sir.

## Page 47

1  Q. When you talked to Mr. Dunigan, did you ever ask him
2  if security said anything to him? You know,
3  "Mr. Dunigan, security is letting you stay here until
4     6:00 a.m., until you get a bus, it's time for you to
5  go," was there any discussion you had like that with
6  Mr. Dunigan?
7  A. Is it okay with you if I scan through this at this
8  point in time?
9  Q. Yeah. Thumbs up. Go ahead and look through it.
10 Because, obviously, you don't have an independent
11 memory, and you would need your report to refresh that
12 memory, fair?
13 A. Yes, sir. Yes, I made contact with Dunigan initially
14 and explained to him that he was, you know, being
15 allowed to be there until 6:00. And it was after 6:00
16 at this point in time, and it was time for him to
17 leave, so ...
18 Q. And at this point -- I apologize. Did I cut you off?
19 A. No, sir.
20 Q. At this point, you're just carrying out the hospital's
21 wishes?
22 A. Yes, sir.
23    MR. O'LOUGHLIN: Foundation.
24    BY MR. HARRINGTON:
25 Q. Under "Briefing With Bronson Security Staff," you have

## Page 48

1  a sentence that says, "Dunigan had been seen by a
2  doctor in the emergency room. He was medically
3  cleared to leave the hospital and discharged from
4  their care." Do you see that?
5  A. Yes, sir.
6  Q. That was information provided to you, right?
7  A. Yes, sir.
8  Q. That's not something -- a conclusion that you reached
9  on your own?
10 A. That is not, sir.
11 Q. Who told you that he was medically cleared to leave?
12 A. One of the Bronson security staff.
13 Q. And context-wise, when I listened to the video and
14 watched the video -- when I listened to the audio on
15 the video, it sounds like that discussion is happening
16 on the sidewalk. Is that consistent with your memory,
17 where the security staff tells you that he was
18 cleared?
19    MR. O'LOUGHLIN: Form and foundation.
20    THE WITNESS: Yes, but that was long after
21 this initial -- this thing we're talking about right
22 now. I was told, when I first arrived at Bronson
23 hospital in reference to Dunigan, that he was seen by
24 a doctor, medically cleared --
25    BY MR. HARRINGTON:

Min-U-Script®    Bienenstock / U.S. Legal Support    (12) Pages 45 - 48
                 Ph: 248.644.8888    Toll Free: 888.644.8080

Page 49

1  Q.  You were told that?
2  A.  -- and discharged from their care.
3  Q.  You were told that?
4  A.  Yes, sir, from the beginning.
5  Q.  From the beginning, one of the security officers told
6  you that he had been seen by a doctor and medically
7  cleared?
8  A.  Yes, sir.
9  Q.  Okay. And at that point in time, you're not
10  questioning that? You're not a doctor?
11  A.  No, sir.
12  Q.  We're going to jump back to your conversation with
13  Mr. Dunigan, but now I want to flash forward.
14     Do you remember when he was being wheeled
15  out of the hospital in a wheelchair?
16  A.  Yes.
17  Q.  You weren't pushing him, were you, in the wheelchair?
18  A.  No, sir.
19  Q.  I think it was Shoemaker, if you remember.
20  A.  I don't know. I don't remember.
21  Q.  At some point in time, while he's being wheeled out
22  and before he gets put into the scout car, didn't you
23  raise a question with one of the officers, the
24  security officers, something to the extent of "Are you
25  sure he's been cleared," or where you actually

Page 50

1  questioned whether he was okay to be discharged?
2     MR. O'LOUGHLIN: Form and foundation.
3     THE WITNESS: I don't remember.
4     BY MR. HARRINGTON:
5  Q.  Okay. Do you ever remember asking any of the security
6  officers, "Was he seen"? Does that sound familiar?
7     MR. VANDER LAAN: Can we short circuit?
8     MR. HARRINGTON: Yes. Go ahead.
9     MR. VANDER LAAN: Your next witness.
10    MR. HARRINGTON: What?
11    MR. VANDER LAAN: Your next witness.
12    MR. HARRINGTON: Oh. Thank you. I
13  appreciate it.
14    BY MR. HARRINGTON:
15  Q.  Okay. Do you ever remember hearing any of the
16  officers --
17    MR. HARRINGTON: Because I didn't have a --
18  I couldn't tell who was saying what.
19    MR. VANDER LAAN: I know.
20    BY MR. HARRINGTON:
21  Q.  Do you ever remember hearing Officer Shaffer say
22  anything, "Was he seen"?
23  A.  Yes, I think so.
24  Q.  Okay. And that was while he was being wheeled out?
25    MR. O'LOUGHLIN: Foundation.

Page 51

1     THE WITNESS: I don't remember if that's
2  the specific time that that was said or not. I don't
3  remember. But at some point in time, yes, somebody
4  posed that question.
5     BY MR. HARRINGTON:
6  Q.  But that was clearly after you were provided
7  information that he had been treated?
8  A.  Yes, sir.
9  Q.  Okay. Let me go back to when you saw Mr. Dunigan.
10  Was Mr. Dunigan combative with you in any way?
11  A.  No, sir.
12  Q.  Did he ever tell you why he didn't want to leave?
13  A.  No, sir.
14  Q.  He, at some point, said he wanted to go to jail?
15  A.  Yes, sir.
16  Q.  Did you find that odd?
17  A.  No, sir.
18  Q.  Why?
19  A.  It's a fairly common thing to hear from individuals,
20  as a police officer. Sometimes people just say that
21  to me.
22  Q.  They just want to go to jail?
23  A.  I don't think that's what they mean, but they just say
24  that sometimes.
25  Q.  I mean, if somebody is taken into custody and they're

Page 52

1  in need of medical treatment, it has to be provided,
2  right?
3     MR. O'LOUGHLIN: Foundation.
4     THE WITNESS: Yes, sir.
5     BY MR. HARRINGTON:
6  Q.  Do you recall you and -- this is also in your report.
7  It's in the section under "Contact With James
8  Dunigan/Trespassing," three paragraphs down, a
9  discussion about taking Mr. Dunigan by his arm and
10  helping him to stand.
11  A.  Yes. I'm reading that now.
12  Q.  Do you recall doing that?
13  A.  Yes.
14  Q.  When you helped him to his feet, did he appear to have
15  difficulty standing?
16  A.  Yes.
17  Q.  Did he seem unsteady on his feet?
18  A.  Yes, sir.
19  Q.  Even though you know that the security staff had told
20  you that he had already been seen, did you start to
21  have questions in your mind as to whether or not this
22  was an individual that was still in need of medical
23  treatment?
24  A.  No, sir.
25  Q.  Okay. At some point in time, you started to have

Page 77

1  jail?
2      MR. O'LOUGHLIN: Form and foundation.
3      THE WITNESS: Yes.
4      BY MR. HARRINGTON:
5  Q. And let's work with that example for a second. If
6  he's on this bench and you're trying to help him off
7  of the bench and, say, this is just in front of Sears
8  or wherever, some store, and he's having a hard time
9  walking, that's an indicator that it's somebody who
10 might be in need of medical treatment, right?
11     MR. O'LOUGHLIN: Form --
12     THE WITNESS: Yes, sir.
13     MR. O'LOUGHLIN: -- foundation.
14     THE WITNESS: Sorry.
15     MR. VANDER LAAN: It's all right.
16     BY MR. HARRINGTON:
17 Q. The fact that -- I mean, Mr. Dunigan wasn't, from what
18 you could tell -- I mean, you made the assumption he
19 wasn't able to walk out of the hospital, was he?
20     MR. O'LOUGHLIN: Form and foundation.
21     BY MR. HARRINGTON:
22 Q. Go ahead.
23 A. At the time, I felt -- obviously, he did not walk out
24 on his own, and I felt that he was pretending that he
25 couldn't walk out on his own.

Page 78

1  Q. But --
2  A. I understand what you're getting at, sir.
3  Q. And what I'm getting at is you felt that way because
4  of your trusting of the hospital?
5      MR. O'LOUGHLIN: Form and foundation.
6      BY MR. HARRINGTON:
7  Q. Go ahead.
8  A. Yes, sir.
9  Q. You're believing the hospital did their job?
10     MR. O'LOUGHLIN: Same.
11     BY MR. HARRINGTON:
12 Q. Go ahead.
13 A. Yes, sir.
14 Q. And if we use the situation of -- well, let me ask you
15 this. Are you upset with the hospital at all with
16 respect to the Dunigan matter?
17     MR. O'LOUGHLIN: Same.
18     THE WITNESS: Yes.
19     BY MR. HARRINGTON:
20 Q. Can you talk about that?
21     MR. O'LOUGHLIN: Same.
22     MR. VANDER LAAN: Form. Foundation.
23     BY MR. HARRINGTON:
24 Q. Go ahead.
25     MR. VANDER LAAN: I don't want this to be a

Page 79

1  therapy session.
2      MR. HARRINGTON: Well, we're not doing
3  reflective and mirror imaging and --
4      MR. VANDER LAAN: I think that's what
5  you're asking.
6      MR. HARRINGTON: No, but it goes to, you
7  know, in 1983 litigation, we get to know officers'
8  impressions, and that's what --
9      MR. VANDER LAAN: To the best you can tell
10 him, please do so.
11     MR. HARRINGTON: Yes.
12     MR. O'LOUGHLIN: My objection still applies
13 given that series of questions.
14     MR. HARRINGTON: Yeah.
15     BY MR. HARRINGTON:
16 Q. Go ahead.
17 A. I can only say that I felt like I was set up for
18 failure from the beginning from Bronson hospital.
19 Q. And can you expand on that, from a factual standpoint,
20 as to why you felt that you were set up for failure?
21 A. Because I relied so heavily on their assessment and
22 discharge from their care that he was -- he was okay
23 to go with us and get arrested from their facility.
24 They wanted him gone. I felt like I was set up for
25 failure. And that me putting my judgment secondary to

Page 80

1  a doctor's, who has already assessed this individual
2  and said he was okay, put me in the situation that I'm
3  in today.
4  Q. In almost any other situation, like I gave you that
5  store scenario, if you saw the guy at a bus stop,
6  virtually any other situation where you saw
7  Mr. Dunigan in the condition and shape that he was in,
8  you'd agree with me that that's somebody you would go
9  to take to get medical care or treatment --
10     MR. O'LOUGHLIN: Form and foundation.
11     BY MR. HARRINGTON:
12 Q. -- fair?
13 A. Yes, sir.
14     MR. VANDER LAAN: Are you done with this
15 line?
16     MR. HARRINGTON: Go ahead, we can take a
17 break.
18     (Off the record at 12:48 p.m.)
19     (Back on the record at 1:00 p.m.)
20     BY MR. HARRINGTON:
21 Q. Okay. Before we took a break, we were just talking
22 about the role that -- the setting of being in the
23 hospital, how much that played in influencing your
24 actions on that day. And I'm just asking this just to
25 get us re-oriented. Remember, that's what we were